**Alice R. JONES, Plaintiff,**

v.

**SECRETARY, DEPARTMENT OF the ARMY, Defendant.**

**Civil A. No. 92–1086–FGT.**

United States District Court, D. Kansas.

Nov. 21, 1995.

Kenneth G. Gale, Focht, Hughey & Calvert, Wichita, KS, for plaintiff.

Connie R. DeArmond, Office of U.S. Atty., Wichita, KS, Major James Macklin, Dept. of the Army, Office of Judge Advocate General, U.S. Army Litigation Center, Arlington, VA, for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

Plaintiff Alice R. Jones brought this action seeking judicial review of a decision of the Merit Systems Protection Board upholding her removal from federal employment. Plaintiff also alleges discrimination on the basis of sex. Trial to the court was held from May 16 through May 18, 1995. The court has received the parties' post-trial briefs and now makes the following findings of fact and conclusions of law on the discrimination claim. The court has reviewed the administrative record and issues its decision on the appeal of the agency action.

## FINDINGS OF FACT

Plaintiff, Alice R. Jones, was employed as Security Officer, GS–11, for the Kansas Army Ammunition Plant (KAAP) in Parsons, Kansas from May 1988 until her removal in April 1990.

Plaintiff had been employed full time by the government since 1980. Plaintiff worked for seven years at the Oklahoma Army Ammunition Plant in McAlester, Oklahoma, four years as a clerk/steno and three years as a Security Specialist Trainee. Plaintiff transferred to Fort Gordon, Georgia in 1987 to take the position of Crime Prevention Analyst. In 1988, plaintiff accepted the job at KAAP.

KAAP is an ammunition production and storage facility. KAAP is government owned and contractor operated.

KAAP employed two uniformed Army officers and a relatively small number of civilian government employees.

During the relevant time period, Lieutenant Colonel Samuel E. Cantey, Jr. was the Commander of KAAP.

Second in command, and plaintiff's immediate supervisor, was Captain Deborah J. Blanton, Executive Officer of KAAP.

As security officer, plaintiff's duties included preventing the loss of munitions and administering the security portion of the operating contract with the civilian contractor. The day to day plant security functions were performed by the contractor's security staff.

Plaintiff's job duties required her to interact regularly with the contractor's security manager and members of the contractor's security staff. Plaintiff also served as the liaison between KAAP and local, state and federal law enforcement agencies. Plaintiff had access to firearms, was qualified to use a firearm, and held a "secret" clearance. Plaintiff also held the title of Provost Marshal. Plaintiff's position was not, however, classified as a law enforcement position.

Cantey testified that plaintiff performed adequately in her first year on the job, although plaintiff began to have problems interacting with the contractor's staff and others.

Cantey found plaintiff to be accusatory, paranoid and suspicious in dealing with members of the contractor's work force. Cantey knew plaintiff was bright and recognized that the Army had given plaintiff a great deal of training. However, Cantey felt that plaintiff lacked the real world experience needed to deal with the contractor's management.

Cantey instructed Blanton to provide plaintiff with assistance and to serve as an example to the plaintiff in dealing with the contractor's management. Cantey instructed

Blanton to take personal charge of plaintiff's training. Blanton was instructed to take plaintiff to the production line to learn industrial security and how to deal with the workforce; to give plaintiff some caring advice and help plaintiff "chill out" a bit; and to bring plaintiff in as a team player. Plaintiff's Exh. 36.

Cantey's philosophy (reflected in Plaintiff's Exh. 36) was not based on any belief regarding the deficiencies of women as a group. Cantey testified that he implemented a similar type of program with regard to a white male employee who worked for Civilian Executive Assistant Carl Allen in another section at KAAP.

Plaintiff came to Cantey frequently with complaints about numerous individuals, both government employees and members of the contractor's staff. Plaintiff was suspicious of others and accused others of engaging in coverups. Plaintiff complained on various occasions, for example, that someone had stolen her keys, searched her office, or diverted documents intended for her from the mail room. Cantey initially investigated these complaints, but found them to have little basis in fact. Cantey found that plaintiff took a small problem and turned it into a major issue.

Cantey received complaints that plaintiff was very accusatory in her dealings with the contractor's security force.

On one occasion, Cantey received a complaint from the contractor's plant manager about some actions the plaintiff had taken. Plaintiff and another person had gone to a particular area of the plant and had thrown some items over a fence to demonstrate that the area was not secure. Cantey verified that this incident occurred as reported to him. Cantey testified that he was embarrassed by this incident and apologized to the contractor's staff.

Cantey heard comments regarding plaintiff's work attire ("flowing muumuu dresses") from production workers. On one occasion, Cantey instructed Blanton to tell plaintiff how to fit in on the production line. Plaintiff later complained to Cantey about Blanton's criticism of her attire. Cantey subsequently saw plaintiff wearing jeans on the line. Cantey heard no additional complaints from plaintiff on this topic.

In July 1989, there was an explosion at KAAP. Two workers were killed and a number of others were injured. An investigation of the incident began almost immediately. The contractor's security force responded immediately and secured the area for the investigation.

Plaintiff was not at the plant when the explosion occurred. Plaintiff subsequently complained that she was not notified about the explosion soon enough. Cantey testified that plaintiff had no official duties regarding the explosion and that plaintiff was not needed, since the contractor's staff responded appropriately to the situation.

On September 5, 1989, Blanton provided plaintiff with a list of "Helpful Hints" that Blanton thought would help plaintiff in communicating with other personnel. This list reads as follows:

1. Approach inspections or other tasks with an open mind and closed mouth. When a manager is talking, he/she is not learning anything.

2. Request an orientation when necessary. If necessary to admit a lack of technical knowledge in order to obtain a more thorough briefing/understanding, do not hesitate to do so. (A Security Officer is not expected to be a technical specialist in all areas.)

3. Be inquisitive. Keep asking why things are done in a given way. Look to solve problems. Pieces of paper are not always the answer.

4. Put the person being inspected or person engaged in conversation at ease. Don't make accusations or assumptions because of what is seen or said. Many times things are not what they seem to be.

5. Listen to what is told, but beware of time-wasting discourses and irrelevant discussions.

6. Get in the habit of saying "yes" when someone offers to show a document, correspondence, record or an observation.

7. Avoid use of questions which suggest an easy or favorable answer, such as, "Your Duty Logs are being made regularly, aren't they?"

8. Don't take a casual statement as a fact. It may be misleading and cause embarrassment if an observation is refuted.

9. Suggest improvements where appropriate, and attempt to provide/recommend possible solutions to the command.

10. Encourage on-the-spot corrections where practicable.

11. Remember that the function of the government staff at KAAP is to monitor contractor operations for compliance with contractual regulations. We do not have the authority to dictate/control the contractor's internal operating procedures. We must keep an arms-length distance and avoid getting involved with their internal personnel problems/procedures.

Defendant's Exh. 3.

Plaintiff construed this document as a warning of less than satisfactory job performance.

In October 1989, KAAP took part in a military readiness exercise named "Proud Eagle." Neither the specifics nor the significance of this exercise was explained to the court. Plaintiff was placed in charge of KAAP's participation in this exercise. Cantey testified that plaintiff was to respond to the messages that were sent to KAAP, e.g., a request for 100 mortars within a week. Cantey testified that any reasonable response would suffice. This exercise was not intended to interfere with normal plant operations. Cantey testified that plaintiff overemphasized the importance of this exercise.

Plaintiff's uncle died on October 22, 1989. On Monday, October 23, 1989, plaintiff submitted a request for leave for the remainder of the week. Plaintiff's Exh. 8. Plaintiff did not inform Blanton of the reason for the requested leave.

Blanton denied plaintiff's request for leave because of the ongoing Proud Eagle exercise of which plaintiff was in charge.

Plaintiff became upset at the denial of leave and went to Cantey. Cantey discovered that Blanton did not know that plaintiff had a family emergency. Cantey told plaintiff that she could leave immediately. Plaintiff responded that she had not decided whether to take leave. Plaintiff eventually went on leave.

Cantey was scheduled to be away from the plant the week of October 30, 1989. Approximately Friday, October 27, 1989, plaintiff met with Cantey in his office. During this meeting, plaintiff requested permission to work at home. Cantey understood her to ask for permission to take work home with her, which he granted. He did not understand her request as a request to work at home during his absence. Cantey never told plaintiff that she could work at home. Cantey testified at trial that it would have been impossible for plaintiff to complete her job duties from home.

During this meeting, plaintiff discussed resigning from her job. Plaintiff was upset about her job, was tearful, and indicated that she felt a great deal of stress. Cantey encouraged her not to quit at that time but to take the next week to think it over.

Barbara Ragain, a friend and coworker, saw plaintiff on Sunday, October 29, 1989 at church. Ragain found plaintiff to be upset and irrational. Plaintiff was crying uncontrollably and referring to herself in the third person.

Cantey was out of town at a conference the week of Halloween 1989. Cantey did not witness the behavior which gave rise to two of the three misconduct charges against plaintiff.

Plaintiff testified that during the week before Halloween 1989, she hardly slept at all.

On Monday, October 30, 1989, plaintiff called Blanton to request permission to work at home. When the request was denied, plaintiff became belligerent. During two phone calls, plaintiff shouted at Blanton and used obscene language.

In the first telephone call, shortly before 7:00 a.m. on Monday, October 30, 1989, plaintiff requested permission to work at home for the week. Blanton indicated that plaintiff would not be able to work at home and asked if plaintiff would like to take sick leave or annual leave. This phone call ended with only minor rudeness on plaintiff's part.

In the second phone call, at approximately 7:40 a.m., plaintiff again requested permission to work at home. Permission was again denied. Plaintiff stated that she did not want anyone to go into her office in her absence. When Blanton responded that she (Blanton) would go into plaintiff's office if necessary, plaintiff became hysterical. Plaintiff began screaming and crying. Plaintiff began using obscene language directed at Blanton. Among other things, plaintiff stated that Blanton had better get her "fucking shit" together. Plaintiff asked if Blanton was a woman or a "dyke." Plaintiff then hung up. Civilian Executive Assistant Carl Allen overheard this last comment while he stood in the doorway to Blanton's office. The call was not on the speaker phone.

On October 31, 1989, plaintiff called Blanton two more times. In the first call, at approximately 6:50 a.m., plaintiff demanded that Blanton take care of two paperwork matters for her. Before Blanton had a chance to respond, plaintiff again used obscene language directed at Blanton. Among other things, plaintiff called Blanton a "fucking bitch" and asked Blanton if she had "a set of balls." Plaintiff hung up before Blanton could respond.

Plaintiff called back at approximately 6:58 a.m., apparently to remind Blanton of a call that needed to be made. When Blanton responded that the plaintiff had promised to take care of that particular matter, the plaintiff called Blanton a "goddamn liar." Among other things, plaintiff called Blanton a "bitch" and a "dyke." Blanton hung up the phone.

Blanton put these phone calls on the speaker phone. Plaintiff's comments were heard by Paulette Wilson, who was Cantey's secretary as well as a personal friend of the plaintiff's.

On October 31, 1989, between 1:00 p.m. and 2:14 p.m., plaintiff made six telephone calls to coworker Carl Allen. During these calls, plaintiff used obscene language directed toward Allen and his family.

In one phone call, plaintiff asked Allen to have his wife call plaintiff and to have his stepdaughter call plaintiff's daughter. Plaintiff called back a minute later and stated, "Don't have [them] call me, I don't want to talk to them sluts."

About a half hour later, plaintiff called and asked Allen to have two of the contractor's security personnel removed from their jobs. When Allen responded that he lacked the authority, plaintiff responded, "Why not, you have all kinds of other fucking authority." Plaintiff called back a minute later and apologized, stating that she thought it was April Fool's Day, not Halloween.

In plaintiff's last call to Allen, plaintiff told Allen, "you tell me what the fuck to do all the time. You are just like all other fucking men."

At trial, plaintiff did not deny making these calls or using the profane language as charged. Plaintiff claimed to not remember many of the details of these events.

On the night of October 31, 1989, plaintiff made approximately 100 calls to the Parsons police on the "911" emergency line. She used profanity during many of these telephone conversations.

Chief of Police Neal Wilkerson spoke to plaintiff that evening. Wilkerson answered approximately 35 or 40 of the calls himself. Wilkerson testified that plaintiff was irrational during some of these "911" calls.

Wilkerson was informed that plaintiff had threatened suicide during one of these calls. Wilkerson called someone from KAAP to find out if plaintiff had access to a weapon. Wilkerson was informed that the plaintiff might have a pistol.

Wilkerson called a Parsons psychologist, Jack Martin, to come down to the police station. Wilkerson asked plaintiff to come down to the police station and talk to them. Plaintiff came to the police station, but stayed only a few minutes. Wilkerson testified that plaintiff was very "hyper." The "911" calls resumed after plaintiff left the station.

During the night of October 31–November 1, 1989, the police went to the plaintiff's home twice.

At approximately 6:22 p.m., two Parsons Police officers arrived at plaintiff's home in response to the "911" calls. Plaintiff would not come to the door and threatened to blow the officers' "fucking heads off" if they came

in. Plaintiff eventually came out of the house and gave her name as "President Jones." The police officers informed plaintiff that using the "911" system as she had was a violation of the law. Plaintiff promised not to call "911" again.

Later that evening, plaintiff resumed her "911" calls.

At approximately 1:13 a.m. on November 1, two officers arrived at plaintiff's home in response to a complaint that plaintiff was in the street disturbing the neighborhood. The front window of plaintiff's house was broken. Plaintiff's car was running with the lights on, the doors open and the stereo blasting. When one of the officers turned off the stereo, plaintiff yelled, "What the fuck is he doing?" Plaintiff also told the officers, "Fuck you, fuck you all, fuck you guys."

Plaintiff was arrested for the harassing "911" calls, disorderly conduct and criminal damage to property. While at the Parsons Police Department, plaintiff talked to Dr. Martin for the second time. Later on November 1, plaintiff went to Wichita's Charter Hospital for psychiatric treatment. Plaintiff was never criminally charged.

On November 1, 1989, Dr. Martin wrote a letter to the Labette County District Court. Dr. Martin indicated that due to her lack of control over her emotions, her manic state, impulsive demands and high level of stress, the plaintiff was "a risk to herself and others." Defendant's Exh. 10.

Cantey testified that he received a copy of this letter near the time when it was written. Cantey testified the letter confirmed what he was beginning to fear—that the plaintiff was out of control. At that time, Cantey believed plaintiff to be a risk to herself or others.

Plaintiff was hospitalized in Wichita from November 1–14, 1989. Three provisional diagnoses were: brief reactive psychosis, possible complex partial seizure disorder, and possible manic episode. However, plaintiff's quick response to medication and normal test results indicated neither a seizure disorder nor manic episode. Brief reactive psychosis was left as the most probable diagnosis.

Plaintiff was discharged from Charter Hospital on November 14, 1989. Plaintiff was not prescribed any medication to take following her release.

On November 7, 1989, Cantey submitted a Report of Unfavorable Information for Security Determination, recommending that plaintiff's security clearance be suspended pending a determination of her mental health. Plaintiff's Exh. 11.

On November 15, 1989, plaintiff's job duties were revoked. Defendant's Exh. 11. Cantey testified that, at that time, he and Blanton believed that plaintiff was not capable of executing her duties. Plaintiff was also instructed to vacate her private office.

Revocation of plaintiff's duty appointments was required pending the security clearance determination.

Plaintiff previously had scheduled vacation time for the fall of 1989. Plaintiff remained on leave through November and December 1989, and into January 1990.

On December 15, 1989, plaintiff's treating psychiatrist Ted A. Matzen, M.D. wrote a letter stating that plaintiff was able to return to work without any limitations. Defendant's Exh. 12.

After her release by Dr. Matzen in December 1989, Cantey found plaintiff to be distant, uncommunicative and rambling.

At some point in time, plaintiff filled out a request for leave covering the period January 8–23, 1990. On January 16, 1990, this leave request was delivered to Blanton by another KAAP employee at the plaintiff's request.

On January 16, 1990, plaintiff reported to work. Blanton had just that morning received plaintiff's leave request for the period January 8–23, 1990. Blanton asked the plaintiff if she still wanted the leave. Plaintiff responded that she did not know if she wanted the leave.

Blanton informed plaintiff to clean out her office. Since plaintiff's job duties had been taken away, there were no security duties for plaintiff to perform. Cantey had informed Blanton to approve any leave that plaintiff requested. Blanton informed plaintiff that there would be no objection to further leave. Blanton instructed plaintiff to return and inform Blanton if plaintiff wanted the leave.

Plaintiff left the plant without informing Blanton of her leave plans.

When Blanton was informed that plaintiff had left the plant, Blanton recorded plaintiff as being absent without official leave ("AWOL").

Blanton never approved the standard form leave request for the period January 8–23, 1990 submitted by the plaintiff.

On January 29, 1990, plaintiff was issued a notice of proposed removal from federal service. Defendant's Exh. 6. Plaintiff's removal was proposed for the following reasons: (1) abusive and offensive language directed to plaintiff's superiors and about a fellow employee; (2) failure to request leave in accordance with required procedures resulting in unauthorized absence; and (3) conduct unbecoming a federal employee. The first charge arose from plaintiff's telephone calls to Blanton and Allen on October 30–31, 1989. The second charge arose from the AWOL on January 16, 1990. The third charge arose from the conduct involving the "911" calls and the police response to plaintiff's home on October 31–November 1, 1989.

Blanton testified that her proposal to remove was based primarily on plaintiff's actions on October 30–31 and November 1, 1989. Blanton received the advice of the civilian personnel office, which prepared the proposal for Blanton's signature.

Blanton testified that following the incidents of October 30–31 and November 1, plaintiff had lost all credibility. As security officer, plaintiff had the authority for law enforcement at the plant. Blanton was concerned with plaintiff's ability to perform these functions and concerned with plaintiff's access to firearms and munitions. Plaintiff's job also required a close working relationship with local law enforcement agencies. Blanton believed that plaintiff's conduct caused plaintiff to lose all credibility with the police department.

Plaintiff was given the opportunity to respond orally and in writing to the proposal to remove. At no time did plaintiff complain to Cantey about sexual harassment.

On April 2, 1990, Cantey issued his decision to remove plaintiff from federal service.

Cantey found the charges contained in the proposal to remove to be factually accurate. Cantey testified that he decided to remove plaintiff for two primary reasons: (1) the events with the police indicated that plaintiff could be dangerous; and (2) the vicious remarks plaintiff made to Blanton and Allen irrevocably damaged plaintiff's relationship with her colleagues and superiors.

Cantey testified that he terminated the plaintiff because she was a threat to the safety of the plant and its personnel. Cantey feared that the plaintiff's conduct of October 1989 could be repeated and that many people could be injured or killed in such an event.

Cantey made himself available to plaintiff on numerous occasions during plaintiff's employment at KAAP. Plaintiff never told Cantey that she felt sexually harassed by Blanton.

Cantey testified credibly regarding his decision to remove plaintiff from federal employment. His decision was not motivated by plaintiff's gender. Further, Cantey had no knowledge of the alleged sexual harassment. Cantey terminated plaintiff because he feared that plaintiff posed a threat of danger at the plant. Further, he found that plaintiff's behavior destroyed her ability to carry out her duties as security manager.

Plaintiff appealed her termination through the appeals process available before the Merit Systems Protection Board. In her appeal, plaintiff asserted for the first time that she had been sexually harassed by Blanton.

Plaintiff claims that Blanton made a sexual advance toward her, which plaintiff rejected. Plaintiff asserts that Blanton then harassed her for rejecting the overture.

During the first few months of plaintiff's employment at KAAP, Blanton took plaintiff on several orientation tours of the plant and grounds (over 13,000 acres). Located on the grounds are a number of ponds. These ponds are used for water storage, to be drawn upon in case of a fire. These ponds are also stocked with fish and are available for use by KAAP employees and military retirees for fishing.

On several of these orientation trips, Blanton took plaintiff to some of these ponds and

discussed fishing, wildlife and various other non-work related topics.

Plaintiff testified that she was very uncomfortable taking these trips to the ponds with Blanton.

Plaintiff testified that on one trip to the ponds, Blanton took plaintiff's hands, asked plaintiff to go fishing with her one night and stated, "We'll have lots of fun." Plaintiff testified that she believed this invitation to be a sexual overture. Plaintiff testified that she told Blanton that she (plaintiff) was a heterosexual and would consider no other sexual preference. According to the plaintiff, Blanton responded that there had obviously been some misunderstanding and that the plaintiff had made her point.

Plaintiff never complained to Cantey about the perceived sexual overture made by Blanton at the ponds. The trips to the ponds ceased.

Plaintiff testified that following this last trip to the ponds, Blanton's attitude changed. Plaintiff testified that Blanton became unfriendly and ridiculed plaintiff in front of others. Plaintiff testified that Blanton ridiculed her style of dress, her jewelry, her footwear and her cologne.

Cantey testified that he felt plaintiff was dressed inappropriately for work in an ammunition plant. Cantey instructed Blanton to advise plaintiff on more appropriate attire and how to fit in on a production line.

Blanton advised plaintiff on proper attire for the ammunition line. Loose fitting clothing and jewelry could get caught in the machinery. Jewelry could drop off into the ammunition powder and cause an explosion. Blanton once advised plaintiff that she should be careful wearing high heels on the icy sidewalk.

Plaintiff's job required that she be available to go to the production line immediately if needed. Plaintiff would not have time to change clothes in the event of an emergency.

Plaintiff interpreted Blanton's comments as a criticism of plaintiff's style of dress and a personal attack.

Blanton had occasion to talk to other employees at the plant about their attire, reminding them of the prohibition on jewelry and the requirement of safety shoes.

Plaintiff testified regarding a staff meeting during which plaintiff sat in Blanton's customary chair. When Blanton arrived late, she told plaintiff to move. Plaintiff testified that she was humiliated by this incident.

Regarding this incident, Cantey testified that plaintiff took a joke and blew it out of proportion and turned it into a personal attack. Cantey testified that Blanton's behavior was "just joking around" and not inappropriate.

Although Blanton has denied that the entire "pond incident" occurred, the court finds that it likely did, although not as related by the plaintiff. The court finds that if an invitation was extended by Blanton, it was simply a fishing invitation. There was a good deal of testimony that Blanton enjoyed fishing on her days off. Blanton took Cantey out to the ponds on orientation tours and invited Cantey to go fishing with her.

The court finds no credible evidence to support plaintiff's assertion that the fishing invitation was in reality a sexual advance. Plaintiff had already reached a conclusion regarding Blanton's sexual orientation. That conclusion having been reached, plaintiff unreasonably assumed that the fishing invitation was a sexual advance. The plaintiff misunderstood the entire incident.

A reasonable person would not have interpreted Blanton's fishing invitation to be a sexual advance.

The court finds it significant that plaintiff never reported the pond incident to Cantey and never complained to Cantey contemporaneously with the alleged sexual harassment, since plaintiff frequently went to Cantey with complaints regarding many other workplace incidents, including trivial matters.

During plaintiff's employment at KAAP, she experienced a number of stressful events in her life. When plaintiff arrived at KAAP, her mother was ill and in a nursing home. In October 1988, the plaintiff's mother suffered a heart attack. In November 1988, plaintiff participated in a security inspection at the plant, which prevented her from visiting her family at Thanksgiving. Plaintiff left Parsons on December 23, 1988, to attend an out of town training course in January, 1989.

On December 24, 1988, plaintiff's mother died. Plaintiff returned to Oklahoma for the funeral, then left again for the training course. In January 1989 plaintiff attended a child support proceeding in Oklahoma. Also in January 1989, the plaintiff visited a cousin whose husband was recovering from a leg amputation. Also in January 1989, plaintiff's sister became ill and was hospitalized. The plaintiff took custody of her sister's two children. Shortly thereafter, plaintiff received word that a niece who had been suffering from leukemia committed suicide. From February to April 1989, plaintiff attended an eight week military police school. Plaintiff also had a temporary duty assignment in McAlester, Oklahoma. During this time frame, plaintiff was trying to resolve a household goods claim from her move from Oklahoma to Fort Gordon, Georgia in 1987. On July 26, 1989, an explosion at the plant killed two workers. As part of her job duties, plaintiff was required to go to the funeral home and photograph the bodies of the victims. Plaintiff found this duty to be very upsetting. On October 22, 1989, the plaintiff's uncle died. Plaintiff became upset about the initial denial of her leave request. During the week of October 23, 1989, plaintiff discussed resigning from her job. During the next week the plaintiff exhibited the behavior which gave rise to two of the charges in the proposal to remove.

The plaintiff's treating physician testified that the cause of plaintiff's mental illness was impossible to pinpoint. Stress and a lack of sleep may have factored into plaintiff's breakdown.

Assuming that plaintiff's breakdown was caused by stress, it does not follow that gender discrimination of any type (or sexual harassment in particular) caused the stress. Many stressful events occurred in plaintiff's personal life during that time period which certainly could have played a role in her breakdown. The plaintiff suffered stress on the job as well. However, the court is unconvinced that plaintiff's breakdown was the result of any unlawful discrimination.

Cantey testified at trial that he believed plaintiff to be the source of much of her own stress at work. Cantey testified that plaintiff always assumed that the smallest incident was a part of a sinister plot to embarrass her.

The court found Cantey to be a very credible witness. Cantey made his decision to terminate plaintiff out of legitimate safety concerns.

The court found plaintiff's testimony to be only partially credible. Plaintiff appears to be very sensitive, to take offense easily and to have a tendency to exaggerate. The plaintiff appears to have great difficulty dealing with stress. The plaintiff becomes upset easily and weeps frequently. Despite the passage of a number of years, plaintiff was incapable of discussing the death of her mother and the other stress-producing events of 1988–1989 without crying.

Blanton criticized plaintiff's attire because it was inappropriate for an ammunition plant and constituted a safety hazard. The plaintiff misinterpreted these comments as harassment or ridicule.

One of plaintiff's complaints at trial was that Blanton's demeanor was gruff and rude. Since Blanton's testimony was presented by way of deposition, the court obviously did not have the opportunity to observe Blanton's demeanor. However, the court did have the benefit of Cantey's testimony. Cantey was unaware of any rudeness or inappropriate behavior by Blanton. The court was impressed with Cantey's sincerity and fairness.

The deterioration in plaintiff's working relationship with Blanton was caused by plaintiff's communication problems, not by any alleged discrimination or harassment. Both Cantey and Blanton received complaints about the plaintiff's accusatory manner. Plaintiff was unable to take constructive criticism. Suggestions for improvement, such as Blanton's list of "Helpful Hints," were taken by plaintiff to be personal attacks.

Plaintiff has failed to meet her burden of persuading the trier of fact that she was a victim of discrimination on the basis of her sex.

There was no evidence presented that plaintiff's continued employment was made contingent upon her submission to demands for sexual favors by Cantey, Blanton, or anyone else.

The "pond incident" in the summer of 1988 did not play any role in the plaintiff's termination in 1990. The court finds no credible evidence that this invitation was a sexual advance.

The court finds that plaintiff failed to meet her burden of proving that the incidents complained of constitute sexual harassment. The court further finds that the plaintiff has failed to show any connection between the incidents of alleged harassment and her removal from employment.

The plaintiff has not met her burden of proving a prima facie case of discriminatory termination.

Assuming the existence of a prima facie case, the court finds that the defendant has met its burden of presenting a legitimate, nondiscriminatory reason for terminating the plaintiff by providing evidence that it terminated plaintiff because of the plaintiff's conduct during October 30–November 1, 1989.

The court finds that plaintiff has not met her ultimate burden of showing by a preponderance of the evidence that defendant discriminated against her on the basis of her sex. The preponderance of the evidence does not show that defendant's stated reason for terminating plaintiff's employment was a pretext for unlawful discrimination, either quid pro quo sexual harassment or hostile environment sexual harassment.

### CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the subject matter. Venue is proper in this district.

Plaintiff brings claims of unlawful discrimination based on sex, specifically, hostile work environment and quid pro quo sexual harassment. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Doc. 121. Plaintiff does not make a claim for disparate treatment other than her claim based upon sexual harassment.

The defendant asserts that the plaintiff failed to exhaust her administrative remedies with respect to her quid pro quo claim and that the court therefore lacks jurisdiction over that claim.

In her appeal to the MSPB, plaintiff raised the following allegations of discrimination: that her removal from employment and the harassment which led to the incident on October 31 and November 1 were the direct result of unlawful sex discrimination and sexual harassment against her in violation of Title VII; that plaintiff's rejection of Captain Blanton's sexual overtures contributed to the harassment of plaintiff by Blanton and contributed to tension in the supervisor-employee relationship; that plaintiff was subjected to sexual harassment by members of the agency and by members of the civilian contractor at the agency, and that her complaints of such harassment were not investigated or remedied; and that the agency has a pattern and history of sex discrimination in hiring and retention of upper-level positions. Tr. Vol. I, at 11.

In her final argument and brief to the Administrative Judge, the plaintiff discussed hostile environment sex discrimination. Tr. Vol. V, at 846, 866–71. Plaintiff's brief did not specifically allege a quid pro quo claim. However, plaintiff cited a case for the proposition that termination for refusal to comply with a supervisor's homosexual advance constitutes a violation of Title VII. Tr. Vol. V, at 866 (citing *Wright v. Methodist Youth Services, Inc.*, 511 F.Supp. 307 (N.D.Ill. 1981)). Plaintiff's claims may be interpreted as including a claim that she received unfavorable treatment because she refused a sexual advance of her supervisor.

Although plaintiff's pleadings before the MSPB do not appear to use the words "quid pro quo" harassment, a review of plaintiff's appeal convinces the court that she did raise the claim, albeit inartfully. Plaintiff's allegations may be interpreted as a claim that submission to Blanton's alleged sexual advance was made a condition of continued employment at KAAP. Plaintiff's allegations were sufficient to put the defendant on notice of this claim. The court finds that the plaintiff has exhausted her administrative remedies with regard to this claim.

This case is of the type commonly referred to as a "mixed case":

> Where a petition for review of a MSPB decision involves both discrimination and other claims it is considered a "mixed case." On the discrimination claim, the petitioner "shall have the right to trial de

novo by the reviewing court." 5 U.S.C. § 7703(c). The other, non-discrimination claims, however, are reviewed on the administrative record. *Hayes v. United States Gov't Printing Office,* 684 F.2d 137, 141 (D.C.Cir.1982). Normally, pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over appeals from the MSPB, except where, as here, the appellant's claim includes an allegation of discrimination. *See* 5 U.S.C. § 7703(b)(2). *See also Wall v. United States,* 871 F.2d 1540, 1542 (10th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990); *Romain v. Shear,* 799 F.2d 1416, 1421 (9th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 840 (1987). *Williams v. Rice,* 983 F.2d 177, 179–80 (10th Cir.1993).

Pursuant to 5 U.S.C. § 7513, an employee against whom removal, suspension for more than 14 days, reduction in grade, reduction in pay or furlough of 30 days or less is proposed is entitled to various procedural protections culminating in an appeal to the MSPB. 5 U.S.C. § 7513(b)-(d).[1]

█ The jurisdiction of the MSPB is not plenary, but is limited to those actions which are made appealable to it by law, rule or regulation. 5 U.S.C. § 7701(a); *Synan v. Merit Systems Protection Board,* 765 F.2d 1099, 1100 (Fed.Cir.1985).

Jurisdiction exists in the district court over cases in which an employee has been affected by an action of an agency which may be appealed to the MSPB, and the employee alleges that the basis for the agency's action was discrimination prohibited by, e.g., Title VII of the Civil Rights Act of 1964. 5 U.S.C. §§ 7702–7703. If the agency action is appealable to the MSPB, and the MSPB finds no discrimination, the action is appealable to the district court. If the adverse action is not appealable to the MSPB, there is no basis for jurisdiction in the district court. *Wall v. United States,* 871 F.2d 1540, 1542–43 (10th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990).

To the extent that plaintiff is claiming discriminatory treatment in matters other than her termination, such as terms and conditions of employment, those matters were not appealable to the MSPB. Consequently, this court lacks jurisdiction over any such claims. The only claims properly before this court involve the plaintiff's termination.

Title VII of the Civil Rights Act of 1964 provides that all personnel actions affecting federal government employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a).

█ When an employer sexually harasses a subordinate because of the subordinate's sex, that employer is guilty of discrimination on the basis of sex. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

█ Sexual harassment under Title VII may be shown under one of two principle theories: quid pro quo discrimination or hostile work environment. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). To prevail on a quid pro quo sexual harassment theory, the plaintiff must show that concrete employment benefits were conditioned on submission to sexual conduct. *Id.* at 1416; *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987).

Plaintiff alleges that she was terminated because of her refusal to submit to Blanton's alleged advances. Thus, plaintiff's quid pro quo claim is one for wrongful termination. *See Martin,* 3 F.3d at 1416.

█ The court applies the familiar three part test to determine whether the plaintiff has established a prima facie case under Title VII for wrongful termination. Initially, the plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination. *Id.* at 1417. Once the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Once the defendant has set forth a facially nondis-

---

**1.** An employee against whom a suspension of 14 days or less is proposed is entitled to similar procedural protections, but not an appeal to the MSPB. 5 U.S.C. § 7503.

criminatory reason, the plaintiff then assumes the burden to prove that the employment decision was the result of intentional discrimination based on an impermissible motive. The plaintiff can prevail either directly by proving that the employer acted with a discriminatory motive or indirectly by showing that the stated reason for the termination was a pretext for discrimination. *Id.*

The ultimate burden of proof always remains with the plaintiff, who must show by a preponderance of the evidence that the defendants violated the relevant provisions of Title VII. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Sorensen v. City of Aurora,* 984 F.2d 349, 351 (10th Cir.1993). In fact, the Tenth Circuit has held that after a trial on the merits, the burden-shifting format drops out. *Sanchez v. Philip Morris Inc.,* 992 F.2d 244, 246 (10th Cir.1993).

■ The trial court's determination of the motivations behind the employer's actions is a factual determination subject to the clearly erroneous standard of review. *Archuleta v. Colorado Department of Institutions,* 936 F.2d 483, 487 (10th Cir.1991).

■ The plaintiff in this case presented no direct evidence of discriminatory motive or intent on the part of the defendant in the decision to terminate plaintiff's employment.

The plaintiff failed to establish a prima facie case of discriminatory termination because she failed to present any evidence that she was terminated because she refused to submit to the sexual demands of Blanton, Cantey or anyone else at KAAP.

The defendant articulated legitimate reasons for the adverse actions against plaintiff. Moreover, the court finds those reasons to be true and not a pretext for discrimination. Thus, the court concludes that the plaintiff failed to meet her burden of proof on her quid pro quo claim.

■ Hostile work environment sexual harassment occurs when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment. For it to be actionable, the sexual harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *Hicks v. Gates Rubber Co.,* 833 F.2d at 1413.

■ In determining whether a plaintiff has established hostile work environment, the trial court should consider any harassment or unequal treatment based on sex, even if those acts are not themselves sexual in nature. Further, incidents of sexual harassment directed at employees other than the plaintiff may be used as proof of the plaintiff's claim of a hostile work environment. *Id.* at 1415. *See also Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 537–38 (10th Cir.1994).

■ The court finds that plaintiff has failed to establish the existence of a hostile work environment. Further, the court finds no connection between the alleged harassment and the plaintiff's termination.

The court has carefully considered all of the evidence presented in reaching this conclusion. It does appear that Blanton engaged in some unprofessional behavior during her tenure at KAAP. However, the court finds on the record as a whole that no sexual harassment occurred.

Only the issue of plaintiff's termination is before this court. The court finds no connection between plaintiff's termination and the alleged acts of harassment. Thus, the court concludes that plaintiff has failed to meet her burden of proof on her hostile environment claim.

### APPEAL OF MSPB DECISION

On January 29, 1990, the Department of the Army proposed to remove plaintiff from her job for: (1) abusive and offensive language directed to superiors and about a fellow employee; (2) failure to request leave in accordance with established procedures resulting in unauthorized absence; and (3) conduct unbecoming a federal employee. Tr. Vol. II, at 104–108. The proposal to remove was prepared by Blanton.

Plaintiff's removal was effective on April 6, 1990. The decision on the proposal to remove was made by Cantey. Tr. Vol. II, at 90–93.

Plaintiff appealed her dismissal to the Merit Systems Protection Board (MSPB). On August 17, 1990, following a hearing, the Administrative Judge affirmed the removal. Tr. Vol. V, at 880–902.

Plaintiff filed a petition for review of the Administrative Judge's decision. On January 28, 1992, the MSPB denied the petition for review, reopened the case on its own motion, affirmed the initial decision as modified, and sustained the plaintiff's removal. Tr. Vol. VI, at 1024–1034. This decision stands as the final decision of the MSPB for purposes of appeal.

In her initial decision dated August 17, 1990, Administrative Judge Antoinette C. Martinez affirmed the decision of the agency. Tr. Vol. V, at 880–902. The Administrative Judge discussed the evidence presented regarding the three charges against the plaintiff. Regarding the first charge of abusive and offensive language, the agency presented testimony from Blanton, Paulette Wilson and Carl Allen. Contemporaneous notes of the phone calls of October 30 and 31, 1989 were admitted. The plaintiff admitted making the calls to Blanton and Allen, although plaintiff did not recall using abusive language. The Administrative Judge determined that the agency had sustained its charge by a preponderance of the evidence. Tr. Vol. V, at 881–883.

Regarding the second charge, failure to request leave resulting in unauthorized absence, the agency presented the testimony of Blanton and Cantey. Blanton testified that when plaintiff returned to duty on January 16, 1990, Blanton asked plaintiff if she wanted the leave she had previously requested for the period January 16–23, 1990. Plaintiff replied that she was not sure if she wanted additional leave. Blanton instructed plaintiff to advise Blanton with her decision. Plaintiff did not advise Blanton but departed the plant. Cantey testified that he instructed Blanton to approve any request for leave made by plaintiff. Blanton reported to Cantey that the plaintiff was unsure of her leave plans but that plaintiff was to advise Blan-

ton if she decided she wanted leave. Cantey was later informed that plaintiff left the plant without requesting leave. The plaintiff did not deny that she left the plant without contacting Blanton. Plaintiff testified that it was her understanding that Blanton had already approved the leave. The Administrative Judge found that the agency had supported this second charge by a preponderance of the evidence. The plaintiff's testimony supported the testimony of Blanton, that Blanton would approve the leave if the plaintiff wanted it. Plaintiff was aware of the proper procedures for requesting leave. The written request for leave relied upon by plaintiff was never formally approved by Blanton. Tr. Vol. V, at 883–885.

Regarding the third charge, conduct unbecoming a federal employee, the agency presented testimony from Neal Wilkerson, Chief of Police in Parsons, Kansas, and Parsons Police Officer James Irwin. Wilkerson testified regarding the "911" calls and the profanity used by plaintiff in those calls. Wilkerson estimated that plaintiff called "911" approximately 100 times. Irwin testified that he was one of the officers who responded to plaintiff's "911" calls. The plaintiff testified that she recalled making calls to the police department, but that she did not think she made 100 such calls. The Administrative Judge found that the agency had proven this third charge by a preponderance of the evidence. Plaintiff admitted making calls to "911." Wilkerson corroborated the charge that plaintiff used profanity in those calls. The Administrative Judge found Irwin to be more credible regarding the details of the arrest. Irwin's testimony was consistent with the police reports filed on the night in question. Plaintiff admitted that she could not remember all the events of that night. The Administrative Judge further found that the agency had established a nexus between the plaintiff's off-duty conduct and the charge, as required by the Table of Penalties. The agency demonstrated that, as security officer, plaintiff's duties involved interacting with the local police. The Administrative Judge agreed with the agency that the events surrounding plaintiff's arrest de-

stroyed her credibility as a law enforcement agent. Tr. Vol. V, at 886–888.

The Administrative Judge then addressed the appropriateness of the penalty. Plaintiff argued that she was under severe personal and professional stress at the end of October 1989 from, inter alia, several deaths and illnesses in the family and difficulties at work. Plaintiff claimed that her actions were involuntary. Plaintiff submitted the deposition of Dr. Ted Matzen, a psychiatrist, who testified that plaintiff was not responsible for her actions on the night of October 31, 1989 and that the behavior was not likely to recur. Plaintiff also relied upon her ten years of satisfactory federal service with no prior disciplinary actions.

In support of the penalty, the agency presented the testimony of the deciding official, Col. Cantey. Cantey testified that he considered the nature and importance of the plaintiff's position. Plaintiff's position involved administering the security portion of the plant's operating contract and interaction with local and federal law enforcement agencies. Cantey testified that he considered the nature and seriousness of the offense. Cantey found that it was unacceptable for a security officer to have been involved in the plaintiff's situation. Cantey considered plaintiff's telephone calls to Blanton and Allen to be not only offensive but vicious. Cantey testified that he lost all confidence and trust in the plaintiff after the October 31, 1989 incidents. Cantey testified that in considering mitigation of the removal penalty, he considered the plaintiff's length of service and the fact that her employment record was good. Cantey also considered the fact that he could not tell whether plaintiff's conduct was the result of illness or not. Cantey testified that he considered demoting plaintiff, but no other position was available to which plaintiff could be reassigned.

The Administrative Judge noted *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 5 M.S.P.B. 313 (1981), in which the Board set forth a list of factors which should be considered in deciding what penalty is appropriate, and found that the agency properly considered the *Douglas* factors. The Administrative Judge found that the plaintiff was a law enforcement officer and was subject to a higher standard of conduct. Noting that she could not substitute her judgment for that of the agency, the Administrative Judge found that the agency did not abuse its discretion and that the penalty of removal did promote the efficiency of the service. Tr. Vol. V, at 897–900.

Plaintiff petitioned the MSPB for review. In its decision dated January 28, 1992, the MSPB denied the petition for review, finding it did not meet the criteria for review contained in the relevant regulations. However, the MSPB reopened the case on its own motion, affirmed the initial decision as modified, and sustained the plaintiff's removal. Tr. Vol. VI, at 1024–1034.

The MSPB addressed the plaintiff's argument that the penalty of removal was too severe because her behavior was involuntary and resulted from a temporary mental illness. The MSPB found that the record was unclear as to whether plaintiff suffered from a mental illness on October 30 and 31, 1989, and, if she did, whether it caused her misconduct. The MSPB noted Dr. Matzen's testimony that the plaintiff had suffered from a brief reactive psychosis caused by stress and a lack of sleep. However, in letters dated March 27 and 28, 1990 addressed to Blanton and Cantey, Dr. LeVine indicated that plaintiff's illness may or may not have been mental or emotional, that a diagnosis had not been definitively established, and a cause not determined. Dr. LeVine cautioned that it might not be wise or fair to conclude that plaintiff suffered from a mental illness. The MSPB noted that Dr. LeVine did not state that plaintiff's episode of illness caused her misconduct. Tr. Vol. VI, at 1027–1029.

The MSPB found that, assuming plaintiff suffered from a mental illness on October 30 and 31, 1989, and that the illness caused the misconduct, the penalty of removal was appropriate. The MSPB noted that the selection of the penalty is generally left to the sound discretion of the agency. The MSPB found that the agency acted within its discretion in selecting the penalty and that the Administrative Judge appropriately analyzed the adequacy of the agency's penalty deliberations. The MSPB noted that the plaintiff's position required significant interaction with state and local law enforcement agencies.

The MSPB cited the established rule that an employee in a law enforcement position is held to a higher standard of conduct than other employees. Noting that the plaintiff's job was not classified as a law enforcement position, the MSPB applied the law enforcement rule by analogy to the plaintiff. Tr. Vol. VI, at 1029–1032. This decision stands as the final decision of the MSPB for purposes of appeal.

Normally, an appeal of an MSPB decision is filed in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). When the appellant makes a claim of discrimination, she has a right to de novo review of that claim in district court. 5 U.S.C. § 7703(b)(2) and (c). When the MSPB decides a case combining both discrimination and non-discrimination claims, the district court takes jurisdiction over appeals from both determinations. Rather than de novo, the district court reviews the non-discrimination claims on the record. *Barnes v. Small*, 840 F.2d 972, 978–79 (D.C.Cir.1988). A mixed case must be treated as a unit, and the district court has jurisdiction over both the discrimination and non-discrimination claims. *E.g., Christo v. MSPB*, 667 F.2d 882 (10th Cir. 1981); *Doyal v. Marsh*, 777 F.2d 1526 (11th Cir.1985); *Williams v. Department of the Army*, 715 F.2d 1485 (Fed.Cir.1983).

The standard of review for a decision of the MSPB on a non-discrimination claim is as follows:

> ... A MSPB decision must be upheld unless the reviewing court determines that it is:
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (3) unsupported by substantial evidence.
>
> 5 U.S.C. § 7703(c).

*Williams v. Rice*, 983 F.2d 177, 180 (10th Cir.1993).

■ The court will affirm a decision of the MSPB sustaining the termination of a federal employee if the "decision complies with the applicable statute and regulations and [if] it has a rational basis supported by substantial evidence from the record taken as a whole." *Martin v. Federal Aviation Administration*, 795 F.2d 995, 997 (Fed.Cir. 1986) (quoting *Hayes v. Department of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984)).

Plaintiff argues that the decision of the MSPB is not supported by substantial evidence. Plaintiff does not assert that the decision was arbitrary, capricious, or an abuse of discretion; or obtained without procedural due process. *See* 5 U.S.C. § 7703(c).

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Hathaway v. Merit Systems Protection Board*, 981 F.2d 1237, 1240 (Fed.Cir.1992). The court must determine whether, considering the record as a whole, the agency's evidence is sufficient to be found by a reasonable finder of fact to meet the evidentiary burden applicable to the particular case. *Bradley v. Veterans Administration*, 900 F.2d 233, 234 (Fed.Cir.1990).

■ To determine whether the MSPB's findings are supported by substantial evidence, the court must "canvas" the entire record, since the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (Fed.Cir.1990).

■ In determining whether the MSPB's decision is supported by substantial evidence, the standard is not what the court would decide in a de novo review, but whether the administrative determination is supported by substantial evidence on the record as a whole. *Hathaway*, 981 F.2d at 1240; *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1115 (Fed.Cir.1987).

■ With regard to each fact challenged on appeal, the court must determine whether, considering the record as a whole, the MSPB's decision was unreasonable that the agency satisfied its evidentiary burden. *Naekel v. Department of Transportation*, 782 F.2d 975, 978 (Fed.Cir.1986).

■ Plaintiff argues that the determination that she was AWOL is not supported by substantial evidence. The court disagrees. Conflicting testimony was presented regarding the issue of whether plaintiff's leave re-

quest was approved. Blanton testified that when plaintiff reported to work on January 16, 1990, Blanton was unsure whether plaintiff wanted additional leave. Blanton was willing to approve further leave if plaintiff wanted it. Blanton instructed plaintiff to let her (Blanton) know. Plaintiff left the plant without informing Blanton of her decision. Tr. Vol. VII, at 187–193, 270–273. Cantey's testimony was similar. Tr. Vol. VIII, at 344–345.

Plaintiff testified that she believed her leave request for the entire period January 8–23, 1990 had been approved. However, plaintiff returned to work on January 16 based on a phone conversation between plaintiff's sister-in-law and Blanton. According to plaintiff, her sister-in-law called Blanton and was informed that Blanton was disapproving the second week of requested leave, beginning with January 16. When plaintiff reported on January 16, Blanton had no work for plaintiff to perform. Blanton told plaintiff she was free to take leave. Plaintiff testified that Blanton did not inform plaintiff to report back on her plans to take further leave. Tr. Vol. IX, at 540–543, 558–559.

■ If found credible, plaintiff's testimony could support a finding that the AWOL incident was based upon a miscommunication or a misunderstanding. Plaintiff's testimony could have supported a finding that Blanton orally approved the leave request. However, the Administrative Judge found the testimony of Blanton and Cantey more credible than the testimony of plaintiff. The Administrative Judge's credibility determinations are "virtually unreviewable." *Henry v. Department of the Navy,* 902 F.2d 949, 953 (Fed. Cir.1990). The testimony of Cantey and Blanton support the fact finding on the AWOL issue. The MSPB decided that the agency satisfied its burden of proving the AWOL by a preponderance of the evidence. Considering the record as a whole, the MSPB's decision was not unreasonable.

Whether plaintiff was guilty of being absent without approved leave was the only fact matter disputed by the plaintiff. Plaintiff argued that since she did not deny the allegations against her, her credibility is not an issue. The court must disagree. The court is aware of no reason precluding the Administrative Judge from considering witness credibility in the present case. Plaintiff did not fully admit the conduct with which she was charged. For example, plaintiff admitted making some of the phone calls and using some of the abusive language. Tr. Vol. IX, at 498. Plaintiff testified that certain events did not occur as related by the other witnesses. For example, plaintiff denied calling the 911 emergency number 100 times as estimated by the Chief of Police. Tr. Vol. IX, at 500. Plaintiff's credibility was plainly in issue here and was properly considered by the Administrative Judge.

Plaintiff argues that her removal is not in the best interest of the service and that the penalty of removal is inappropriately severe.

■ An agency may remove an employee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). The statute requires the agency to show a connection between the employee's misconduct and the employee's job responsibilities. *Brook v. Corrado,* 999 F.2d 523, 527 (Fed.Cir.1993).

To make this showing the agency relied upon Cantey's testimony. Cantey noted that plaintiff's position as security officer required trust and confidence. Tr. Vol. VIII, at 334. The credibility of the security program was damaged by plaintiff's conduct. Tr. Vol. VIII at 335–336. Plaintiff's conduct with the police destroyed Cantey's confidence and trust in her. Cantey testified that he was not confident in her ability to perform her job duties or to interact with the police. Cantey could no longer trust plaintiff to have access to the plant. Tr. Vol. VIII, at 339. The agency emphasized the sensitivity of the operation at KAAP, the risk that a mistake in judgment by plaintiff could result in the loss of lives, and the lack of trust in the plaintiff.

■ Given the level of trustworthiness required by plaintiff's position and the consequences of an error in judgment by the plaintiff, the agency showed by a preponderance of the evidence the connection between plaintiff's misconduct and her removal to promote the efficiency of the service. An agency's reasonable loss of trust and confidence

sufficiently establishes the necessary nexus. *Brook,* 999 F.2d at 527.

█ Determination of the appropriate penalty is a matter committed to the sound discretion of the employing agency. *Id.* at 528. The court defers to the agency's choice of penalty unless it exceeds the range of permissible punishment set by statute or regulation or unless the penalty is "so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion." *Id.*

█ The penalty must be reasonable in light of the sustained charges of misconduct; however, reasonableness in this context means that the agency's choice of penalty must not be "grossly disproportionate" to the offense. *Webster v. Department of the Army,* 911 F.2d 679, 686 (Fed.Cir.1990), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

█ In *Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 306, 5 M.S.P.B. 313 (1981), the MSPB set forth the following factors which may be considered in determining what penalty is appropriate in a disciplinary case: (1) the nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities; (2) the employee's job level and type of employment; (3) the employee's past disciplinary record; (4) the employee's past work record; (5) the effect of the offense on the employee's ability to perform at a satisfactory level and its effect upon supervisory confidence; (6) the consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) the consistency of the penalty with the applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense; (10) the potential for the employee's rehabilitation; (11) mitigating circumstances; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

The list of factors discussed in *Douglas* was not exhaustive. Further, not all of the twelve factors will be pertinent in every case. *Parker v. U.S. Postal Service,* 819 F.2d 1113, 1116 (Fed.Cir.1987). The Administrative Judge need not consider every one of the 12 *Douglas* factors mechanistically by a preordained formula. *Webster,* 911 F.2d at 686.

█ A review of the record reveals that Cantey considered all applicable *Douglas* factors prior to reaching his decision. Cantey considered the nature of plaintiff's position, noting that plaintiff was responsible for managing the security of the entire plant. Plaintiff's position required trust and confidence. Tr. Vol. VIII, at 338, 334. Cantey considered the charge of conduct unbecoming a federal employee to be very serious. Cantey found it unacceptable for his security officer to have been involved in such a situation and to have been arrested by the local police. The nature of the offense was a key consideration for Cantey. Tr. Vol. VIII, at 334-335. Cantey noted that the AWOL was the least serious of the three charges. Tr. Vol. VIII, at 350. Cantey considered the effect of the offense on plaintiff's ability to perform at a satisfactory level and its effect upon supervisory confidence. Cantey testified his trust and confidence in plaintiff was destroyed by her conduct. Tr. Vol. VIII, at 339. Cantey considered the agency table of penalties, noting that a first offense of conduct unbecoming a federal employee could support a removal action. Tr. Vol. VIII, at 350, Vol. IX, at 413. Cantey testified that plaintiff's conduct damaged the credibility of the security program. Tr. Vol. VIII, at 335-336.

In mitigation, Cantey considered the plaintiff's past work record, which he considered to be very good. Tr. Vol. VIII, at 347. Cantey was aware of no prior disciplinary actions and found plaintiff's disciplinary record to be very good. Tr. Vol. VIII, at 350, Vol. IX, at 409. Cantey did not know whether plaintiff was suffering from an illness or not. No definitive medical evidence was presented to him. Tr. Vol. VIII, at 347-348, 352, 356. Cantey did not know whether plaintiff's actions were willful or not. Tr. Vol. IX, at 411. Cantey had no information on the potential for plaintiff's rehabilitation. Tr. Vol. IX, at 409-410. After plaintiff returned to work, her behavior continued to be unusual. Tr. Vol. VIII, at 354. Cantey considered alternative sanctions. Cantey con-

sidered demoting the plaintiff, but there were no positions available which the plaintiff could perform. Tr. Vol. VIII, at 350–351, Vol. IX, at 411.

After considering all the relevant factors, Cantey concluded that the nature and seriousness of the offense outweighed the mitigating factors. Cantey found that plaintiff had lost the confidence of her supervisors and had destroyed her ability to perform her duties. Cantey determined that plaintiff could no longer effectively perform her duties. The determination of the MSPB that the agency had properly considered the *Douglas* factors is supported by substantial evidence.

Plaintiff argues that she was not a law enforcement officer and therefore not subject to the stricter standard of conduct applicable to law enforcement officers. While it is undisputed that plaintiff's position was not classified as law enforcement, plaintiff performed duties which were comparable to a law enforcement officer. As security officer, plaintiff was responsible for the entire security program at KAAP, including industrial, physical and personnel security. The duties of plaintiff's position included investigation of crimes and treason, controlling access to the plant, granting of interim security clearances to employees, establishing procedures for the safeguarding of classified information, and inspecting for security violations. The position was specifically designated as a liaison with local, county, municipal and state law enforcement officials, and federal law enforcement officials, including the Federal Bureau of Investigation, United States Attorney, and United States Marshal. Tr. Vol. II, at 287–289 (position description). The MSPB applied the higher standard for law enforcement officers by analogy only. The court finds that analogy to be appropriate under the facts and circumstances of this case.

Army regulations specify that removal is an appropriate punishment for a first offense of conduct unbecoming a federal employee. Off-duty misconduct may be the basis for removal if the appropriate nexus is demonstrated between the misconduct and the charge of conduct unbecoming a federal employee. Tr. Vol. II, at 144–152 (Table of Penalties). As security officer, the plaintiff's duties required interacting with the local police. The circumstances surrounding plaintiff's arrest destroyed her credibility as a law enforcement officer. The finding that plaintiff's off-duty misconduct constituted conduct unbecoming a federal employee is supported by substantial evidence.

Termination is within the range of permissible punishments set forth by the applicable regulations. Termination is not excessively harsh or grossly disproportionate to the offense committed by the plaintiff. The agency properly considered the relevant *Douglas* factors in determining the appropriate penalty. The MSPB's finding that the plaintiff's termination promoted the efficiency of the service is supported by substantial evidence.

**IT IS BY THE COURT THEREFORE ORDERED** that the decision of the Merit Systems Protection Board is affirmed.

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendant on all other claims for relief.